Chief Justice Robertson
delivered the opinion of the Court.
This is a writ ot error, prosecuted by John Kilby, to recover a judgment obtained against him, in detinue, for a slave, Charlotte, by James Haggin.
The evidence embodied in the bill of exceptions, is somewhat loose, and indeterminate. But, although the facts arc not presented in a manner, properly satisfactory, and leave much for inference and presumption, a careful survey of them authorizes the following deductions.
That in the fall of the year 1824, John U. Waring, procured to be issued, chiefly for his own benefit, writs of fieri facias on judgments,in the names of Haydon and others, against the estate of Benjamin Elliot,of Woodford; thatB. Elliot was considered insolvent, and had been ascertained to be so, by legal process, several years prior to 1824; that his wife had a joint interest in the estate of her father, who had died sometime in 1824, before the date of Waking’s executions, but there had been no distribution among the heirs; that B. Elliot and wife, were in possession of some slaves, (of whom Charlotte was •Qne) sent to her by her father, before his death, but. the title to whom, he had not vested in B. Elliot, and did not mean to do, because he was bankrupt and improvident; that in a short time after her father’s death, his executor, James Elliot, knowing, (as he said) that it had been the intention of his testator, tp secure to Mrs. Elliot, in trust, whatever property he might be disposed to give to her, conveyed the slaves, then in the possession of B. Elliot, as before stated, *209 Vo Benjamin Taylor,in trust, for the use of Mrs. El-Hot, and her children; that Waring, knowing of the death of Mrs. Elliot’s father, had purchased a beneli-cial interest, in the judgments, on which he caused the executions to issue.
The judgments had been rendered several years before 1824; that he directed the executions tobe levied on the slaves in B. Elliot’s possession, but that they fled, or were taken from Woodford, to Franklin, to avoid a levy on them by the sheriff of Wood-ford, who held Waring’s executions.
That Waring, expecting to subject the slaves, went to Lexington, to procure from Doctor Warfield, an execution on a judgment, which he had obtained against B. Elliot, in 1816, but which he had never been able to enforce; and whilst he was conversing with Warfield, on the subject of buying, or taking charge of his claim, for collection, Warfield received a letter from James Haggin, informing him of Mrs. •Elliot’s condition, and proposingto him, to take charge of his execution, and that of Trotter, if they would issue them to a blank county, and confide them to him, and to endeavor to make their debts out of the slaves; provided, they would consent, that one half of the total amount, which might be made, should be secured to Mrs. Elliot.
Warfield instantly acceded to this proposition, because, as he proves, he had not trusted B. Elliot, on the faith of any expectant interest in his father-in-law’s estate; and would, therefore, be unwilling to coerce his judgment by a sale of ]Hrs. Elliot’s Interest, without securing to her some provision; and accordingly, he enclosed a fierifacias, on his own judgment, and one which issued on the judgment of Trotter, to Haggin.
That Haggin delivered the executions to the sheriff of Franklin, and directed him to advertise the Side of the slaves, a memorandum of whose names hp gave him, and also requested him to order the sale at B. Taylor’s mill, in Franklin, near the Scott and Woodford county lines; that the sheriff hesitated, because, he had not s,een the slaves, and had no assa- *210 ranee (hat they would be forthcoming; but on being assured by Haggin, that they should be at the place of sale on the day which should be appointed, he yielded, and'advertised the sale accordingly. Only one advertisement was put up, and that, which was on the door of the Franklin court house, was torn down by James Elliot, on the same day on which it was ■placed there.
That five of the slaves, (two women and three children) of whom Charlotte was one, were sold ao-cording the advertisement, and purchased by Hag-■gin, for a-sum, which exceeded the amount of the executions, about $8Q; that the only persons at the -sale, were Haggin, James Elliot, Taylor’s miller,Mr, Alexander, and two deputy sherifFs; that Alexander made a bid, but desisted, on being told by J. Elliot, that the sale was for Mrs. Elliot’s benefit; that the Slaves were worth considerably more than what Hag-gin bid for them; that the sheriff who held executions for Waving’s benefit, delivered to him, after the delivery of Wartiled’s,and Trotter’s, appropriated the residuum ofHaggin’sbids, (about $80) to one of Waring’s executions, and endorsed a credit, and enclosed them all by mail, in letters, addressed to Waring, atYer-saillcs; that Waring received the execution on which no credit was given, but there is uo positive proof that he ever received that on which the credit w-as endorsed; that the slaves remained with Elliot and wife, after Haggin’s purchase, and Waritig’s executions having been afterwards levied on them, some of •them, and some others of those sent by her father, to Mrs. Elliot, and who had not been bought by Haggin, were all sold under Waring’s executions, and were purchased by himself; Charlotte was one of these, and was hired by Waring to Kilby; that com* . missioners, appointed for that purpose, had made partition of the slaves of Mrs. Elliot’s father, on the day before the sale at Taylor’s mill, and allotted to her, those who were, as aforesaid, in tbe possession of her •liusband and herself. That Haggin acted throughout, as the friend of Mrs. Elliot, and was actuated by disinterested benevolence, for her and her children. That, after his purchase of the slaves, he had fold James Elliot (never having done, so before) of *211 ¿be contract which he had made with Warfield, suid proposed that, if he would pay to Warfield and Trotter, one half of their debts, according to his agreement with them, the slaves should be secured to Mrs. Elliot; that they remained with her under the hope and expectation, that this proposition would be fulfilled. That Haggin acquainted Warfield with all that had been done, and proposed to pay him; but Warfield refused to take any thing, until it could be ascertained, whether Mrs. Elliot would hold the benefit of the purchase, intending, if she should, to receive one half of his debt; but if she should not, to release Haggin from any liability to him on his purchase. Before the sale under Waring’s executions, the right of property to Charlotte, was tried by a jury, empannelled by the sheriff who returned that she was subject to sale.
After the evidence was closed, Kilby’s counsel moved the court for seventeen instructions, all of which were refused; and such instructions were given, as the court considered applicable to the facts proved; one of which was, that if Haggin had been influenced by a fraudulent design, to defeat or embarrass the creditors of B. Elliot, the sale to him was void. Many of the instructions asked for, were founded on misconceptions of the law of the case, and some others were abstract. The court did not. err, therefore, in refusing to give these. .
Of those which remained, there is only one which is. not obviously embraced in the instructions given by. the court,, and that is the sixteenth, which is in substance, that if Haggin had-any agency, director indirect, in pulling down the advertisement, his purchase was null and void, so far as B. Elliot’s creditors might be-concerned. We are inclined to think that there is no error in.the refusal to.give this instruction^,, for two reasons:
1st. There is- no evidence of Haggin’s agency in this fraud, or of his -knowledge of it, except what might be inferred from his Zeal and general conduct, in favor of Mrs. Elliot; and this, we would consider insufficient to criminate him, and invalidate his purchase.
A? between execution creditors, not date of deliver;/ of execution to officer, but date of levy gives priority of i^u,.
Jf officer lety second execu-lionfirst, lie is liable to creditor in first execution, but levy and sale, under junior execution, are valid.
*212 2d. If the fact hypothetically assumed, had bee*, proved, the general instruction, given by the court, would virtually embrace the subject matter, of that which was refused, (the sixteenth.)
A motion for a new trial was also overruled; and whether the facts warranted the verdict, is the only question, remaining for consideration.
If, by placing his executions in the hands of the sheriff of Woodford, where the slaves then were, Waring acquired a lien on them, that lien extended no farther than to secure them against the alienation of B. Elliot, or against their sale, by an execution, which might be levied after his had been levied.
As between execution creditors, it is not the date of the execution, nor of its delivery to the officer, but the date of the levy, which gives priority of lien. Tabb vs. Harris IV. Bibb 29, and the authorities there cited.
We not only admit the authority of these cases, but approve them, as rational and just. The only object of attaching a lien to an execution, is to prevent the debtor from defeating the creditor, by alienating or embarrassing his estate. The reason of the law in such a case, does not apply to a competition between execution creditors, and “cessante ralione cessat lea;.” Moreover, it is but sheer justice, to give the preference to the creditor, who, by his superior industry and vigilance, shall have procured the first levy, on the debtor’s estate.
It would seem unreasonable, that a creditor, who had been dormant, of unwilling, or afraid to direct a levy of his execution, or to shew property, to the officer, should take the spoil from a more active and adventurous creditor, after he had found it, and, at his own hazard, shewn its liability. If such were the law, not onJy injustice, but fraud would be legalized.
To prevent partiality or fraud, by the officer, it is his duty to levy first, the execution which shall have been first delivered to him; and hence, it is his duty, to note the date' of delivery. But this is directory»
It does not affect execution creditors, nor purchasers, under their executions. If the officer fail to *213 levy the first execution, but shall levy another first, he will be responsible to the creditor to whom he shall have done injustice; but the levy of a junior execution will not be invalidated.
Irregularity or defect in advertisement of sale, under execution, will not affect validity of sale, unless purchaser was privy to it.
Possession, remaining with defendant in execution, after sale under the execution, docs ‘ not per se, render sale fraudulent. Interest of wife, in her deceased father’s slaves, not liable to execution fo¡r husband’s debts, until after distnbvr tion But, if husband acquire, by descent, joint interest in slaves, his interest liable to execution before distribution.
*213 It results, that the sale at Taylor’s mill, is not invalid, merely, because Waring’s executions issued, and were delivered first, even if the sale had been made in Woodford; a fortiori, it remains unaffected, as Waring’s executions created no lien, whatever, in Franklin.
Nor could the sale be affected by any irregularity or defect in the advertisement, unless Haggin'had been privy to it.
Nor can the inadequacy of the first, nor the place of sale, nor the paucity of bidders,or of persons attending, per se, invalidate the sale. These may operate, in connexion with other facts, as indicia of fraud.
Whether the verdict of the jury, was authorized by the evidence, therefore depends entirely on whether the sale at Taylor’s mill, was clearly proved to be fraudulent.
The possession by B. Elliot and wife, is not, per se, fraudulent, as it would be if the sale had been made by them, by private voluntary contract. T,he reason why the retention of possession, by the vendor, after a sale by private contract,is denounced as fraudulent, does riot apply to coercive sales, by execution. The purchaser of property, at an execution sale, may permit the unfortunate debtor, or his destitute family, to retain the temporary use arid possession of it, without incurring the imputation of legal fraud. The fact may be a badge of actual fraud. But the law does not consider it, as in itself fraud. As this principle has been settled by this court, and by the supreme court of the union, and by other respectable tribunals, we deem it useless to consume our time, or enlarge this opinion, by reasoning upon it.
Whether the possession was sufficient evidence of fraud “de facto,” was a question for the consideration of the jury. It was susceptible of explanation, and was satisfactorily explained, at least, so far as to have *214 justified the verdict, if there had been no other objection to it.
If it had been proved, that the sheriff of Woodford, refused to levy Warfield’s and Trotter’s executions,, before Waring’s, and that the slaves were, therefore,, taken by Maggin, or on his advice,, to Franklin, to evade Waring’s and give precedence to theirs, it would follow necessarily, that the purchase by Hag-gin was fraudulent, as to Waring. But conceding that he would have been guilty of a fraud on Waring, by running the slaves from Woodford, to prevenir a levy on them for Waring, and to give Warfield and Trotter precedence, still, as the jury had a right to infer, from the evidence, that neither he, nor Mrs. Elliot, nor Warfield, nor Trotter, removed the slaves; or caused their removal, their verdict should not, on this ground, be disturbed. The facts, on this subject, arc such, that honest men might reasonably differ in their deductions from them. And so they, tire, in relation to the advertisement and place of sale. Presumption should be cautiously and reluctantly indulged against the integrity of such a sale as this. The whole case, therefore, is resolved into one isolated inquiry: what was Haggin’s intention in procuring the executions, directing the sale, and making the purchase? Was it to defeat or frustrate Waring or other creditors of B. Elliot, or was it bona fide, and by legal means, to procure the extin-guishment of the debts due to Warfield and Trotter, and thereby secure some provision for Mrs. Elliot and her children, out of the remnant of her own property T>
If the former be clearly shown to have been his object, the verdict should not stand; but if the latter appear to have been his aim, or there be such semblance of probability that it was, as to have authorized 4he jury to infer it, the verdict must stand.
The facts authorized the jury to infer that Hag-gin’s motive was disinterested benevolence; and the evidence and verdict of the jury would not allow us to say that his conduct or the means to which he re-, sorted, should be characterized as illegal, sinister oje dishonorable.
*215 When Waring’s executions were delivered (o the sheriff of Woodford, and when the slaves went to Franklin, there had been no distribution; and it is not shown, nor attempted to be, that the slaves belonged to Mrs. Elliot, or to her husband, before the allofment by the commissioners. Waring had no right, therefore, to levy on and sell them, as the property of B. Elliot. B. Elliot had not become possessed of them, in right of his wile, and as her slaves, it is not shown that they had been devised to her, and they certainly had not descended to her, so as to vest the absolute right in her or her husband. If the husband instead of the wife,had owned, by descent, a joint interest in the slaves, that interest would have been liable to execution for his debt. Even then, however, the entire right to no one slave, could be sold before distribution. But the joint interest of the wife does not vest in the husband, until, by distribution, that interest shall have been reduced to unity and identity. Even as against Elliot and wife, therefore, Waring had acquired no legal lien on these slaves; and as the husband had not reduced them to possession, either in fact or'in contemplation of law, as the, slaves of his wife, Waring could not have subjected them, or the husband’s potential interest in them, to his executions, without the aid of the chancellor. This aid would have been withheld until an adequate provision had been secured to the wife. See Elliot vs. Waring, (decided by this court) and the authorities there cited. Many other authorities could be cited. The doctrine is abundantly and undeniably established.
Many of the cases go so far as to allow the wife, as the complaining party, a provision out of her own estate, against the legal claims of creditors. We are inclined, however, to the opinion, that the principle of these last cases is too comprehensive, and that it should be restricted to cases of ante-nuptial contracts, or at the greatest extent, to bona fide, post 'nuptial conveyances in trust, which, for some defect cannot be sustained at law, against the claims of certain creditors.
Be this as.it may, there can be no doubt, that Mrs. Elliot has an equitable right to a provision ■ out of *216 these slaves, in defiance of Waring’s claims, as beneficial creditor. And we suppose that sbe might have injoined iheir sale, at any time before her husband's right to them was perfected
It must result, therefore, that if, whilst the slaves were in this condition, a portion of them, (not exceeding a reasonable provision) had been secured to her by deed of trust, from the holder of the legal title, or by any other legal means, Waring’s executions could never have touched them, and he Would have no right to complain, if, before the title of her husband was perfected, and whilst she held this pre-ex-isting equity, the legal title has been placed, by allowable means, where it is not subject to B. Elliot’s debts, no creditor has a right to say that any injury has been done to him. And if it has been so fixed, by the forms of law, in good faith, and on a valid consideration, it is safe and intangible.
Apprehending that Waring might eventually subject the property to his executions, and leave Mrs. Elliot and her children destitute, Haggin, as her neighbor and friend, espoused her and their cause, and determined to secure to them, if possible, some little of that which, in justice, belonged to her, and to which her husband, and consequently his creditors, had not yet acquired any legal right. And how did he propose to effect this humane and commendable object? By fraudulent bills of sale or deeds of trust? or even by procuring a conveyance in trust, in consideration only of her equity, which might have been sustainable? Ño. He staked the issue on the double consideration of her equity and the rights of her husband’s creditors; and with these combined, resort, ed to a mean provided by law. Warfield and Trotter had a right to give to Mrs. Elliot the entire benefit of their executions against her husband. If they had done so, and the slaves had been sold legally, after they became subject, and had been purchased by her friend, and secured to her in trust, who would have been injured or would have just cause of complaint? But Warfield and Trotter were not asked to •surrender their debts for her benefit. They were only told, that if they would place executions in Hag- *217 giii s hands, he would endeavor to sell properly enough to satisfy them, provided they would agree that one half of the proceeds should be secured to her, to whom all the property equitably belonged. With a magnanimity signally honorable to them as men and as creditors, they cheerfully and promptly acceded to the proposition. Under their executions, a portion of the slaves were sold on the day after distribution, and Haggin became the purchaser, for the benefit of Mrs. Elliot and her children, and thereby extinguished the debts of two fwia.yMe judgment creditors, and rendered himself responsible for half of them, without any other advantage or benefit, than (he consolation of having done as act of kindness to the helpless and destitute, without injuring any one. Until distribution, Waring could not have sold the slaves, and Mrs. Elliot could have enforced against him, her equity.
Such Is our construction of this case, upon the facts exhibited in the record.
The only ground of complaint whjch remains for Waring, is, that by fraud or improper contrivance, the sale was so conducted as to enable Haggin to buy more of the slaves than were necessary for the satisfaction of the debts for which they were sold, and thereby diminish the number left for sale, to satisfy Waring’s executions. This would be a good ground of objection to Haggin’s legal title, if it were sufficiently established. The facts are such as to justify the opinion, either that Haggin, by his own conduct, procured the sale to be so conducted, as to secure a purchase of the slaves, at less than their value, or that he had no agency whatever, in any means which necessarily resulted, so as to prevent rival bidding. However, therefore, we might have considered this point, if vve had beon on the jury, as the evidence was such as to allow the deductions made by the jury, a new trial should not be granted on this ground.
There is no case in which, in morality or law, “the end justifies the means.” But if there could be any such cases, this would be one of them. As Mrs. Elliot had a just claim to a provision, even some artifice might be connived at and allowed, to secure it to *218 her. . Therefore, the most favorable construction should be put on Haggin’s conduct and motives, in his efforts to serve her and secure to her some portion of her property.
Taking the facts individually, therefore, there is no sufficient cause for a new tria!. When they are all_ combined, there is not weight enough in their united bearing, to overturn the verdict. And the result oí ■ our investigation is, that, although a verdict either for or against Haggin, might not have been set aside without encroaching on -the constitutional rights of ■ juries, the authority for granting a new trial wouid •-liave been clearer, .if the verdict had been against Mm.
* Having'tlius disposed of the questioirof'fraud, it ■’is- proper to mention two other considerations, either of which might be sufficient to sustain the verdict, if every thing else had been against it.
1st. It is admitted that the slaves were conveyed by the executor, to-B. Taylor, in trust for Mrs. Elliot and children, before Wa ring’s executions issued, "Whether he had competent authority to make over the title, docs not certainly appear, but in the absence of-any-proof, it may be reasonably presumed that the '''title was in him. '-If this be admitted, then it would result as an inevitable consequence, that Waring had “acquired no right to Charlotte, by the sale under his •executions; because, whatever may be the real truth of the case, there is nothing in the record to invalidate the title which the deed was intended to vest in •Taylor.
But Haggin’s purchase was made with'the assent •of the trustee, as may be presumed from all the facts, 'ánd as the jury had a'right to infer. But whether it was or not, he acquired the possession by his purchase, and that precedent possession would enable him to succeed against Waring, if the deed were ■validas we are supposing it to be.
2d. If Waring assented to the credit, endorsed by ' the sheriff of Franklin, oh his execution, for the excess of Haggin’s bid over the united amounts of .She-executions of Warfield and Trotter, he thereby *219 ratified • the sale and waived all objection to it. Whether he ever did so assent, cannot be certainly ascertained from this record, but the jury were ized to infer, from the facts, that he did; and, therefore, according to the facts, the jury had a right to find against him on this ground,if there had been nc other which would have permitted such a verdict.
Talbot and Wickliffe, for ■ plaintiff; Crittenden and Haggin, for defendant.
Wherefore, the judgment of the circuit court is . affirmed.